**JAMIE ELIZABETH SCHMID**
California Bar No. 339135
**HOLLY SULLIVAN**
California State Bar No. 216376
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666

Attorneys for
Mr. Andres Barron

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.:  23-CR-2620-AGS |
| Plaintiff, | Hon. Andrew G. Schopler |
| v. | Date: April 14, 2025<br>Time: 10:00a.m. |
| ANDRES BARRON, | **ANDRES BARRON'S SENTENCING MEMORANDUM** |
| Defendant. | |

Mr. Andres Barron is asking for a sentence of 24 months followed by three years of supervision. The following sentencing memorandum will explain why that sentence is sufficient but not greater than necessary. Mr. Barron has been incarcerated since October 21, 2023, meaning he has already spent 541 days in custody.

**I.    How did we get here**?

Prior to the federal government deciding to take over Mr. Barron's case, he was working with his Public Defender and District Attorney to resolve his case in an immigration safe manner.  The DA signaled to his Public Defender that the office was likely to agree to an alternative disposition in which Mr. Barron could plead guilty to PC 370/370.5, a nuisance charge, along with a misdemeanor gun possession for felony probation. The parties were going to have Mr. Barron released to an inpatient treatment program so he could work on recovering his sobriety.

1

2    One of the reasons the state was amendable to an immigration safe plea

3 agreement was because of Mr. Barron's recent success in the diversionary drug court

4 program. Mr. Barron had successfully completed the intensive drug court program.

5 *Exhibit A.*  He graduated the program in August of 2022. He completed 90 days at the

6 inpatient center Freedom Ranch and attended group counseling, individual counseling,

7 domestic violence classes, and he obtained full-time employment.

8    San Diego County Drug Court is a minimum 18-month intensive treatment

9 program, and completing drug court is no small feat. There are very strict rules, even

10 down to a dress code for how the participants must dress when coming to court. The

11 drug court Judge will impose sanctions when individuals forget to wear a tie but were

12 otherwise dressed in a suit. Because of his completion and success in this difficult

13 program, many of Mr. Barron's convictions were reduced to misdemeanors and his

14 probation terms terminated.  *See* PSR ¶ 44, 45, 46, 47.

15    Before his conduct in this case (and before relapsing), Mr. Barron was working

16 with the Fresh Start team of state attorneys to expunge his record and clear a pathway

17 to citizenship. Although some may disagree with this statement, but Mr. Barron is for

18 all intents and purposes, an American. He has grown up in the United States nearly

19 the entirety of his life. Mexico is not home.

20    However, everything changed with the federal government took Mr. Barron's

21 case. An immigration safe plea was out the window. The options from the federal

22 government were clear:  You either (1) plead guilty to something that will cause your

23 guaranteed deportation or (2) go to trial and try to fight for your green card. And so,

24 Mr. Barron went to trial.

25    Another reason that Mr. Barron went to trial is because he wanted to challenge

26 the "plain view" finding of the methamphetamine in his car under his seat. A multiple-

27 day evidentiary ended with the conclusion that there is no way that the Officer Truong

28 could have seen the drugs in "plain view", but Judge Moskowitz found other grounds

MR. BARRON'S SENTENCING MEMORANDUM

to validate the search. *See* Dk. 33.

## II.    How did we *actually* get here?

But, the question remains, how did we actually get here? How did we get to a place when a man who has been in the United States since he was three months old is about to be deported from his home?  The answer to that question necessitates looking back on Mr. Barron's childhood.

### A. "I got Hepatitis B from cleaning up my dad's projectile vomit as he passed away from liver cirrhosis."

"Man, up and drink a beer," Mr. Barron's father said to him as he whacked six-year-old Andy across the face. Little Andy's eyes looked at his father in fear as the two gulped down beer next to each other. And so, Mr. Barron began drinking beer at age six because of his father. *See also Exhibit B* at 2 ("Psychology Evaluation). It was a common pattern in his childhood. If Mr. Barron misbehaved first came the beating and next came the beer. Soon a punch on the arm or a slap across the face induced a Pavlovian-like response in young Andy. His mouth started to water and anticipate the taste of the hoppy, cold beer. "By the age of eight, I believe I was an alcoholic. I would feel sick without a beer and drink them before school" explains Mr. Barron.

After sips of beer, six-year-old Andy would be brought around to the houses of his family members. There he witnessed cousins, aunts and uncles smoking meth, shooting up, and drinking hard liquor. "I grew up seeing a lot of gang activity and violence, and I thought all of that was normal," explains Mr. Barron. To Andy, watching his two uncles beat each other silly was akin to a "normal" individuals' family night dinner.

Because of the neighborhood he grew up in, at a young age, Mr. Barron also began to distrust the police. He saw his family member's interactions with law enforcement, and he became fearful. For example, when Mr. Barron was only eight years old, he was handcuffed and tackled by a drunk police officer in the neighborhood. And because of Mr. Barron's father and the extended family's drug use and problems with law enforcement, Mr. Barron moved to three different elementary

school growing up.

Even though Mr. Barron's father abused him, Mr. Barron loved his father like any young child loves their parent. Mr. Barron's father was his role model. He thought his lifestyle was what a normal dad's lifestyle was. Mr. Barron's father would frequently sneak into restrooms and come out with a bloody nose. He would pass out on the floor after yelling intelligible nothings.  But he was still young Andy's dad.

As Mr. Barron progressed into his teenage years, his father's body started to ballon. His skin yellowed and greyed. The doctors told him to stop drinking. But his body continued to balloon, and his skin continued to grey. Multiple ulcers formed in his father's stomach. And so, his father drank even more to stop the stomach pains. "By the end of his life, he was throwing up blood and what look liked his own guts every day," sobs Mr. Barron. Every day, Mr. Barron watched his father die. He cleaned up his father's vomit, urine, feces and blood. Every day, he asked his father to stop drinking. But till the end, alcohol was his dad's greatest love. And soon, meth became Mr. Barron's greatest love.

**B.** "**Meth numbs me. It masks all the pain. It helps me want to live life.**"

Around the age of 14 or 15, Mr. Barron first tried methamphetamine. He immediately liked it. He felt invincible, happy and confident. After his father died, Mr. Barron started self-medicating more and more frequently with methamphetamine. Mr. Barron describes the death of his dad as what triggered his full-blown meth addiction. Meth masked the feeling of hopelessness, despair and anger he felt after seeing his father die before his eyes. Instead, meth allowed Mr. Barron to push those "bad" feeling aside.  His brain purred with good thoughts. This is good, thought Mr. Barron. This drug is helping me. After Mr. Barron's father died, he did nothing but smoke methamphetamine and drink for an entire year. Soon, Mr. Barron's body became accustomed to methamphetamine. He no longer felt the euphoria. Instead, meth allowed him to stay awake and work double shifts at his job. "It allowed me to work well and be a good employee," explains Mr. Barron. "At least, that is what I

believed at the time." Meth gave him energy and kept his depression at bay.

Even with the challenges of his childhood and his meth use, Mr. Barron was able to earn his GED and work various jobs throughout his life. However, as noted in the psychology report: "Mr. Barron acknowledged that substance abuse has been a constant in his life, interfering with his potential and work ethic. Even when presented with significant opportunities, such as one in aerospace engineering, he struggled with self-sabotage and addiction, impacting his stability and personal growth." *Id.* at 9.

### C. "I wish I could go back to my life after drug court and shake myself."

Throughout his life, Mr. Barron has had important periods of sobriety. The first was a three-year in 2011. The second was around a 2-year period during 2021. During these periods of sobriety, Mr. Barron gained his life back. He spent quality time with his children. He had employment. He attended church and welcomed God back into his life. He also self-reflected. *Exhibit C* ("Reflections from Andres Barron).

 

Mr. Barron, for all his demons, loves his children so incredibly deeply. Being a father is the most important part of Mr. Barron's life. In custody, Mr. Barron misses

taking his children to school, going to their school graduations and presentations, and helping his children with homework at the end of the day. When his children attended preschool, Mr. Barron was a member of the parent committee. *Exhibit D.* These memories feel especially painful because Mr. Barron knows he will never have a normal life with his children ever again given the collateral consequences of this case. These memories are also especially painful in custody because Mr. Barron is forced to reflect on all the ways that his severe addiction has severely negatively impacted his children.



Today, Mr. Barron's two biological children with Jasmin Mendez are struggling. Chula Vista Elementary performed a psychoeducational assessment and diagnosed Mr. Barron's son with multiple learning disabilities. The report notes the child's lack of stability at home and periods of homelessness. Mr. Barron's daughter is attending therapy to address her mental health. Like the ways Mr. Barron's drug-addicted father harmed his childhood, Mr. Barron is seeing the same cycle repeat with his own children. This is an extremely difficult realization for Mr. Barron. As an adult, he never ever wanted to be like his dad. One can only imagine the psychological impact that Mr. Barron's deportation and removal from the United States will have on his young children. *Exhibit E* ("Letters from Children"). Mr. Barron story is one of

intergenerational trauma and addiction. It is an incredibly sorrowful story.

### III.    How did Mr. Barron's childhood impact his brain development?

As noted by Dr. Shibley in *Exhibit B*, "[t]rauma early in the lifecycle, particularly when it is recurrent and when it occurs in the context of an inadequate caregiving system, has pervasive effects on cognition, socialization, and the capacity for affect regulation."  Mr. Barron was given beer by his father at age six and continued to drink throughout his childhood. Mr. Barron started using methamphetamine as a young teenager and continued to use heavily in his young adult years. He was physically abused and sexually abused. He witnessed violence throughout his childhood.

So, while Mr. Barron's brain was developing, it was being poisoned by drugs and alcohol. The frontal cortex, the region critical to planning, judgment, decision making and personality is especially sensitive to this poison. *Id.* Therefore, "Mr. Barron's poor decision-making might have something to do with impaired brain functioning paired with a severe addiction to methamphetamines." *Id.*

Maybe someone without Mr. Barron's background would have an easier time quitting methamphetamine once and for all, but for the longest time, substances were the way that young Andy emotionally regulated. It is built into his brain from such a young age. And that is why Mr. Barron feels so powerless to substances. It is so incredibly hard to shake something that has been holding your hand your entire life. It is so incredibly hard to say goodbye to something that helped you survive your childhood and that was always there for you.

### IV.    What does Mr. Barron's future look like?

. Counsel has gotten to know Mr. Barron very well over 1.5 years. He is a timid and kind individual who struggles constantly with feelings of hopelessness, worthlessness and pervasive guilt. *See Exhibit B* at 7. There is a strong desire to express hope and optimism about Mr. Barron's future. But with that desire also comes the reality of Mr. Barron's situation. He will be deported to a country that is not home. He will be separated from all his loved ones and his children. ICE will place Mr. Barron

at the Port of Entry in Mexico and tell him to go away and never come back. He will be without a support system. He won't be at home. It is hard to express hope or optimism about such a painful future. But Mr. Barron will have to try his best to make a new life in Mexico.

## V.    Why a 24-month sentence?

### a. Mr. Barron spent 90 days in solitary confinement at MCC during which his mental health deteriorated, and Mr. Barron was treated inhumanely throughout his court proceedings.

After an incident at MCC, Mr. Barron was placed in the SHU (solitary housing unit). He remained in solitary confinement for over three months. He tried to appeal the administrative action taken against him but had no success. He was only supposed to be in the SHU for 2-weeks, but that 2-week stay became an over 3 months stay. In the SHU, Mr. Barron was only provided 2 legals calls during his three-month stay. He was forced to use his own sock as toilet paper. He started experiencing paranoia and hallucinations. Mr. Barron requested to see a psychiatrist multiple times due to his deteriorating condition, but that did not occur. When Dr. Shibley evaluated Mr. Barron at MCC, she called Counsel immediately and told Counsel that Mr. Barron needed to get out of solitary confinement as soon as possible. MCC told Counsel that Mr. Barron was in the SHU indefinitely. Thankfully, the U.S. Marshals took Counsel's concerns seriously and moved Mr. Barron out of the SHU and to San Luis Detention Center. However, it is impossible to overstate the psychological trauma that Mr. Barron endured in the SHU. From Counsel's perspective, the way that Mr. Barron was treated in the SHU at MCC was inhumane. The three months spent in solitary confinement should be taken into account when imposing a sentence.

Furthermore, during the course of Mr. Barron's case, he experienced inhumane treatment separate from the SHU. MCC stopped giving Mr. Barron his medication for a number of days causing him to vomit from withdrawals during this evidentiary hearing in Judge Moskowitz's courtroom. Dk. 46-49. Mr. Barron was visibly pale, sweating and shaking. Additionally, Mr. Barron also was not given a mattress to sleep

on for a number of days, and he was forced to sleep on metal coils. This should also be taken into account when fashioning a sentence.

### b. Mr. Barron will forever be barred from the United States as a consequence of his conviction.

As already discussed, Mr. Barron will lose his Legal Permanent Resident status and be deported from his home. For Mr. Barron, this is the most severe punishment that could have ever been imposed against him. Additionally, Mr. Barron will likely spend months in immigration detention after serving his federal sentence. Because Mr. Barron is a green card holder, he will have to go in front of an Immigration Judge before he is deported. This process will take time, and Mr. Barron will be detained during this time. This should be taken into account when fashioning a sentence.

### c. Mr. Barron has never served as much time in custody as he has already served in this case.

According to the Presentence Report, Mr. Barron has never served more than 200 days in custody. Already in this case, Mr. Barron has been in a prison cell for 524 days. Mr. Barron is asking for a sentence of 730 days. This request is a marked and stark increase from his previous longest sentence of 200 days. Additionally, due to his active immigration detainer, Mr. Barron will not receive any earned time credits, nor will he receive any time off his sentence if he was to qualify for RDAP.

### d. Mr. Barron's response to the government's sentencing memorandum.

The government is recommending 8 years for Mr. Barron and attached numerous text exchanges to draw inferences and assumptions about Mr. Barron. The government's statement of facts talks more about Mr. Barron's phone then the actual trial itself. Furthermore, the government's memorandum contains almost no mention of Mr. Barron's traumatic past, his serious drug addiction, his previous success in recovery nor do they mention one positive thing about Mr. Barron. The government's

memorandum does not contain an appropriate 3553(a) analysis when all that is being considered is the "bad" when the law requires the government to consider the full picture of who Mr. Barron is. Similarly, the government makes no mention of the major collateral consequences in this case regarding Mr. Barron's loss of legal permanent resident status.

**e.** T**he 3553 factors support a 24-month sentence**.

This sentence is supported by the 3553(a) factors. Mr. Barron suffered from an incredibly unstable and violent childhood. He turned to drugs and alcohol at young age. Mr. Barron put in work throughout his life to try to remain sober, and he has periods of sobriety in which he is law-abiding. The nature of his case is serious, but not as serious as other possession with intent to distribute cases in our district. Mr. Barron was convicted by a Jury. The facts at trial and in the Presentence do not indicate a man who is selling large quantities of drugs or is incredibly involved or sophisticated. This is one single event with a man who is an addict who has about 40 grams of methamphetamine under his driver's seat cushion. A sentence of 24 months is a substantial sentence and will promote respect for the law and provide just punishment. Mr. Barron will not be getting off with a slap on the wrist nor will 24-months signal to others that possession with intent to distribute isn't a serious crime.

Furthermore, the public will be protected for future crimes regardless of the sentence in this case as Mr. Barron will no longer be allowed to enter or reside in the United States. If this Court gives Mr. Barron years in prison, he will be deported to Mexico as man in his 50s. As this Court knows from its countless 1326 sentencings, it can be very different for men in their later years to find work in Mexico. The longer Mr. Barron stays in custody, the greater the chance he will be more institutionalized, and struggle to prosper in Mexico.

/ / /

/ / /

/ / /

For all the reasons stated in this memorandum, 24-months is the only reasonable sentence in this case. It is sufficient but not greater than necessary to reflect the sentencing considerations in 3553(a).

## VI.   Conclusion

Mr. Barron asks this Court to impose a sentence of 24 months followed by three years of supervised release.

Respectfully submitted,

Dated:  April 7, 2025              *s/ Jamie Elizabeth Schmid*
                                  *s/ Holly Sullivan*
                                  Federal Defenders of San Diego, Inc.
                                  Attorneys for Mr. Andres Barron
                                  Email: Jamie_Schmid@fd.org
                                  Email: Holly_Sullivan@fd.org

# EXHIBIT A



**Behavioral Health Services**

December 12, 2023

Re: Andres Barron

South County Center for Change (SCCFC) is a program of TURN BHS in partnership with the South County Superior Court. SCCFC is a highly structured, outpatient drug and alcohol treatment program. The Drug Court Program is a co-occurring treatment program that offers group counseling, individual counseling, case management, and mental health services. Along with treatment services, participants are required to attend a minimum of three self-help meetings per week and drug testing done randomly up to four times a week.

Intake Date: 01/11/2021
Discharge Date: 08/26/2022

Mr. Barron advanced through the 4 phases of the Drug Court Program and completed with a successful termination on 08/26/2022. Prior to his enrollment in Intensive Outpatient treatment, Mr. Barron successfully completed 90 days of Residential Treatment at the Freedom Ranch. As part of the Drug Court Program, Mr. Barron attended group counseling sessions, individual sessions, and case management sessions to address his criminal/addictive thinking patterns, relapse potential, and improve his coping skills. He enrolled in Domestic Violence classes, obtained full time employment, and reunited with his family. Mr. Barron remained substance free throughout the program with no positive UA tests. He was an active and positive participant of the program who demonstrated commitment to change.

If there are any further questions, please contact Mariko Matsuda at ▮▮▮▮▮▮▮▮

Sincerely,

Mariko Matsuda, MS, CATC IV
Program Manager

# UNDER SEAL

# **EXHIBIT B**

# EXHIBIT C

Andres Barron

February 2022

RELAPSE WARNING SIGNS

1.Boredom

Lack of interest or difficulty staying motivated is a warning sign for me so I spend time with my partner and kids or work. Even if I don't feel like it because by the end of the day the feeling of boredom passes.

2. Exposure to drug use

Exposure myself to be around people who use or drink is a warning sign. Even if I'm not thinking of using or drinking myself. It gives me sense of pride in thinking that I got it under control but consciously it's just creating a reservation for relapse. I have removed myself from those kinds of situations even changed my place of employment.

3. Family

Thinking or being around many of my family members who are active in the crime and drugs life style is also one of my warning signs. I have stopped communication with most of my family.

4. Complacency

Feeling satisfied with myself or comfortable with my life has led me to slip, letting my guard down and becoming a little too confident in my recovery. I have to stay active with my recovery and participate the most I can.


5. Denial

Ignoring problems or responsibilities is a warning sign that I tend to minimize but just talking about it to someone in my support circle can help make things easier.

Andres Barron

February 2022

## WHAT  I  LEARNED  IN  DRUG  COURT

While in drug court I have learned to have patience throughout this path of recovery. I have learned that many of the problems in my life were because of my own drug use and life style of crime. The counselor has taught me many things and helped me to identify the root of my problems so I am able to address my issues. I have faced a few bumps along this process and being accountable for my actions have helped me to understand that if I mess up its ok it's not the end of the world.  I just have to be honest with myself and others that it is ok to ask for help because everyone needs help at some point. I've learned so many healthy ways to cope with whatever life throws at me instead of turning to drugs. I am grateful to have been given this chance to participate in what I believe is a life changing program. I wanted to give up many times, go on the run, but I stayed put. They were just thoughts like so many that cross my mind on a daily basis but I'm glad I have stuck it out. I would have never believed in a million years that a program would be able to change my way of life and my way of thinking.

# EXHIBIT D



# EXHIBIT E

Dear Judge

I know my Dad has done bad but I can't Promise you that he Won't go good. But if you do let him out he Well be he for my 6 grade camp when you guys Probably get it. It well be march and my 6 grade camp in next month and he could be here for are new dog

from
A

Dear Judge

My name is B████
B████, im in the 3rd grade.
I go to ████████████
district. I like to play soccer
and the guitard. I miss my
dad so much, I wish he
did come home soon
so he can take me to
school, and help with
my homework. I miss
baking cakes with my
dad. Please give him
one more chance, so
he can come home
soon.

        Thank you

            B████